Kevin **ROONEY**, Plaintiff–Appellant,

v.

Michael Gerard **TYSON**, Defendant–Appellee.

No. 359, Docket 97–7322.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1997.

Decided Oct. 24, 1997.

Michael J. Coyle, New York City, for Plaintiff–Appellant.

Robert W. Hirth, Sidley & Austin, New York City (James D. Arden, Julie A. Torrey, of counsel), for Defendant–Appellee.

Before: MESKILL and CALABRESI, Circuit Judges, and BRIEANT, District Judge.[*]

CALABRESI, Circuit Judge:

Kevin Rooney appeals from a decision of the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Chief Judge*), vacating a prior jury award of $4,415,651 in damages for breach of his oral employment contract with defendant Michael Gerard Tyson, and granting Tyson judgment as a matter of law.

## I. Background

### A.

Rooney claims that, pursuant to an oral contract in 1982 between himself and Cus D'Amato, Tyson's legal guardian and manager, he was to train Tyson until Tyson turned professional, whereupon he would be Tyson's trainer "for as long as [Tyson] fought," and would be paid ten percent of Tyson's boxing earnings. Based upon this agreement with D'Amato, Rooney trained Tyson for twenty-eight months, without compensation, until Tyson turned professional in March 1985.

In September, 1984, D'Amato arranged for Tyson to enter into a written contract with Reel Sports, Inc., a firm owned by Jim Jacobs and William Cayton. Tyson granted Reel Sports the authority to designate his boxing manager and agreed with their decision to make Jacobs the manager. This contract was effective from June 30, 1984 (Tyson's eighteenth birthday), until June 30, 1991. Rooney alleges that, prior to Tyson's first professional fight, D'Amato told Jacobs and Cayton on several occasions that Rooney would be Tyson's trainer for the duration of his professional fighting career, and that he would be paid ten percent of Tyson's boxing earnings. But he concedes that there was never any written agreement to this effect.

D'Amato died in 1985, while Tyson was enjoying ever-increasing success as a professional boxer. At the same time, rumors abounded that Rooney would be replaced by a more established trainer. Rooney claims that he therefore confronted Jacobs and that Jacobs allegedly reaffirmed the "contract." According to Rooney, although Jacobs offered to put the agreement in writing, he (Rooney) declined the offer and said that a handshake was sufficient. The rumors of Rooney's replacement persisted, however. And so, in 1987, in response to a press inquiry, Tyson authorized Jacobs to say that "Kevin Rooney will be Mike Tyson's trainer as long as Mike Tyson is a professional fighter . . . ." A videotape of this press statement was sent to Rooney. Thereafter, Rooney continued to train Tyson and was paid fully for each of Tyson's professional fights.

In 1988, Tyson was involved in both a highly publicized divorce and a lawsuit against Cayton. That same year, Rooney appeared on television where he commented on the divorce and seemingly also sided with Cayton. This apparently angered Tyson, and on December 9, 1988, Rooney read an article in the *New York Post* stating that Tyson would no longer train with him. Rooney then brought the present action against Tyson, claiming a breach of the 1982 employment contract.

By its verdict, the jury made clear that it believed Rooney's allegations.

### B.

This case presents a series of questions relating to the scope of the New York employment-at-will rule. The New York Court of Appeals has consistently applied a strict rule that "absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920 (1987); *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (refusing to recognize a

[*] The Honorable Charles L. Brieant, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

common-law tort theory of liability based on abusive or wrongful discharge and refusing to adopt the implied covenant of good-faith in employment contracts). But the "reach" of this rule has been explored less by the New York Court of Appeals than by the federal courts.

Thus, some federal courts have held that, in New York, terms of duration ending upon retirement, or on the reaching of retirement age, are too indefinite to sustain employment other than as "at will." *See, e.g., Wanamaker v. Columbian Rope Co.*, 907 F.Supp. 522, 538 (N.D.N.Y.1995) ("Oral assurances of lifetime employment, or a suggestion that an employee would be fired only for cause without more, are insufficient to support a claim for breach of employment contract under New York law."), *aff'd,* 108 F.3d 462 (2d Cir.1997); *Hunnewell v. Manufacturers Hanover Trust Co.*, 628 F.Supp. 759, 762 (S.D.N.Y.1986) (an employer's verbal assurances that an employee would be retained through normal retirement age do not specify a sufficiently definite term of employment); *see also Peters v. MCI Telecomm. Corp.*, 685 F.Supp. 411, 414 (S.D.N.Y.1988) (an employer's promise of "long term employment" is "even less definite than a permanent appointment or employment until retirement, neither of which states a clear and definite limitation on the employer's right to discharge"). When the term of duration is specified with reference to one party's engagement in a profession, however, some federal courts have held such contracts were definite. *See Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 763 (S.D.N.Y.1990) (upholding a three-year promotional contract that would be "automatically extended to cover the entire period [the boxer is] world champion and a period of two years following the date on which [the boxer] thereafter cease[s], for any reason, to be so recognized as world champion"); *cf., e.g., Warner–Lambert Pharm. Co. v. Reynolds, Inc.*, 178 F.Supp. 655, 660 (S.D.N.Y.1959) (upholding a contract to pay royalties on "Listerine" for "as long as this preparation is manufactured or sold" by the plaintiff).

And our own court, while recognizing that "the resoluteness with which the New York Court of Appeals has reaffirmed the 'at will' rule indicates that exceptions to the rule are discouraged," *Arledge v. Stratmar Sys., Inc.*, 948 F.2d 845, 848 (2d Cir.1991), has stated that the at-will principle applicable to employment contracts "is not generally applicable outside the realm of employment," *Rule v. Brine, Inc.*, 85 F.3d 1002, 1013 (2d Cir. 1996). We have also suggested, however, that the at-will rule may cover independent contractor relationships that arise in the employment context. *See Arledge*, 948 F.2d at 848 (a contract involving an independent contractor is "sufficiently analogous to an employment contract to bring it within the purview of the 'at will' rule"); *see also Handel v. STA Travel Ltd.*, 198 A.D.2d 32, 32, 603 N.Y.S.2d 436, 436 (defendant permitted to terminate an at-will employment relationship at any time, despite the fact that plaintiff was an independent contractor).

While these federal cases have relied on the decisions of various New York courts, there is, nevertheless, no clear holding by New York's highest court on the scope of the at-will employment rule. For example, the New York Court of Apeals has never spoken to whether the rule operates differently when an allegedly indefinite term linked to life, retirement, active engagement in the profession, etc. refers to the employer's career or life rather than to the employee's. Nor has it ruled on whether the at-will rule applies to contracts involving independent contractors in relationships that are analogous to those created by ordinary employment contracts.

■ These and other issues concerning the reach of the New York at-will rule are highly germane to the case before use. Accordingly, in certifying a question of the validity of the particular contractual relationship before us, we are not asking the New York Court of Appeals to interpret a contract or to decide a case for the federal courts but rather to elucidate a series of open and recurring questions of New York law.[1]

---

1. To ask the New York Court of Appeals simply to interpret the contract or to decide the case before us would, of course, be improper because it would contravene the object of diversity jurisdiction of presenting the actual parties to a litigation with a neutral, federal, playing field.

## II. Certification

■ We certify the following question to the New York Court of Appeals: Does an oral contract between a fight trainer and a professional boxer to train the boxer "for as long as the boxer fights professionally" establish a definite duration, or does it constitute employment for indefinite duration within the scope of the at-will rule?

It is hereby ordered that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of the briefs, appendix, and record filed in this Court by the parties. The parties are directed to bear equally such fees and costs as may be directed by the New York Court of Appeals.

This panel retains jurisdiction so that after we receive a response from the New York Court of Appeals we may dispose of any questions that remain on appeal.

\* \* \*

### Certificate

The foregoing is hereby certified to the Court of Appeals of the State of New York, pursuant to § 500.17 of the Rules of the New York Court of Appeals (McKinney's 1997 Rules of Court) and § 0.27 of the Local Rules of the United States Court of Appeals for the Second Circuit, as ordered by the United States Court of Appeals for the Second Circuit.